Right ahead. May it please the Court, my name is Michael Kennedy, I'm the first assistant with the Federal Public Defender's Office in the District of Nevada, and I represent Robert Joseph Marshall. This case involves wiretaps, confrontation, and restriction on cross-examination. Starting with the wiretap, traditional investigative techniques were being used when the issuing judges on the Voluse First Extension, Second Extension, and Third Extension were being told expressly that they were unavailable and that they were inadequate. Specifically, search warrants. We could not use a search warrant when, in truth and in fact, three months before a search warrant had been used. Not by the FBI. By Metro. And I focus, Your Honor, on the First, Second, and Third Extension for two reasons. First, that was 95 to 98 percent of the actual tape evidence at trial from those wiretaps. And as the Carnaro case shows, each wiretap standing on its own needs to pass the commands of the wiretap statute. Second, and very importantly, there was a meeting between the FBI-Affiant on December 7th of 2000. Placed up here on the board, the first extension of the Voluse wiretap was December 18th of that year, after that meeting. The January 17th, 2001 extension was after that meeting, and the February 16th was after that meeting. The purpose of the meeting was that this character, Voluse, was caught double-dipping the miracles of call waiting. He's on one line doing a huge ecstasy deal. He puts the guy on call waiting and he starts talking to his handler from the Metro. So the FBI and Metro get together to discuss what was Voluse's role as an informant, rather than telling the issuing court on the 18th of December, the 17th of January, and the 16th of February the true facts that there had been a search warrant, what was told the issuing court was that it was a mere street encounter, which was a lie. There was no street encounter. Rather than telling the issuing court that Voluse had been debriefed, had been given an interview, had disclosed all the dealings, that was not told to the issuing court. Rather than tell the issuing court that controlled buys had been made from Voluse and Voluse's associates and seven Metro officers where they are surveilling when that happened. That was hid from the issuing court. And how much of that did the FBI know? All of it after December 7th of 2000, Your Honor. I suggest that they knew it before that, but we don't even have to get to that question because as I say, there was only one tape that was played at trial from the first two wiretaps and their extensions and the Voluse wiretap, the original wiretap. All of what I'm telling you was after the meeting with the FBI and Metro for the express purpose of discussing Richard Voluse. Even more importantly, the Metro had him on the hook. They had the goods on him. They found evidence of trafficking, guns, all sorts of items and he had already given up two main suppliers. He had agreed to be an undercover agent and he had done all these things. The traditional investigatory technique of just executing the search warrant, confronting him with the evidence, and having him spill his guts to three years of dealing worked. And the FBI knew that before they sought the 18th, January 17th, and the 16th. So what the true facts were are outlined at page 17 of the reply brief, excuse me, page 14. This is just a representative, but there were six things that were the true facts that were omitted from these three affidavits. In addition, what was also said was, for instance, Voluse was apparently stopped and searched by Las Vegas Metro Police when they knew it was not a street encounter. All of this goes to the fact, Your Honor, that what ended up happening was even with the wealth of all this evidence, there was no evidentiary hearing ever held on the wiretaps. Quite simply, the indictment and the evidence at trial was a fruit of these illegal wiretaps. This stuff was withheld from the court. In addition, the original Voluse affidavit, the one on November 17th, even though there was only one tape that came out of that, you have to at least explore under Ninth Circuit law, Ippolito being the case. I want to make sure I understand the chart that you've got here. The statement at the top following each number is the statement that's found in the affidavit. Yes, that are in quotes. Okay. So the quote is, Voluse was apparently stopped and searched by the Las Vegas Metropolitan Police when the true facts were that they had done numerous control buys, executed a search warrant, seized drugs and firearm evidence, completed a suspect interview, and he was on the hook to testify. Down under number three, you have two things in quotes. The first is evidently from the affidavit. When he omitted that, what is that a quote from? The second one is the affidavit, which says they did have irrefutable evidence, but they omitted to tell the court it. Wait, wait. So what's that a quote from? Irrefutable? Search warrant affidavits themselves. The search warrant affidavit contains the words irrefutable independent evidence of Voluse's involvement? You have an open quote and you don't have a closed quote. That would be a quote from the second site, which is at 707 to 721. Which is what? Which is the search warrant affidavit that I got, went out and got within, after I received this on September. So that's from the LVPD? You have an open quote without a closed quote. I'm very confused as to what that means. You have a quote in front of irrefutable. Oh, I'm sorry. And no closed quote. Yeah. It would be, it would be from the, from what I filed for the issue, for the review. Okay. So that's not from, from the government's documents. The third one is, I apologize. Okay. So what the, so what the, so what the FBI was telling the district court on number three was that they had been contacted by LVPD. So they did disclose to the court that LVPD had contacted Voluse. Actually the FBI contacted Metro. Okay. Right. But he, but they admitted that Voluse had been contacted by the LVPD. And this is what the, this is what the FBI is telling the court. Right. So they are admitting to the court in the process of, of, of seeking these warrants that they failed to have that irrefutable evidence when in fact they, well, wait a minute. No, that, that they did. I'm still trying to understand your chart. I want to say that this, that the FBI is telling the district court that Voluse has been contacted by LVMPD and they are telling him that he has apparently only partially disclosed his criminal activity. Okay. Now you gave me, you gave me the quote again. Where's the close quote on that? Okay. And, and, and, and that is what it is, the motion that I filed to the reviewing court with that's your, that's your language. Yes. Okay. Two exhibits that that's based upon the letter from the U S attorney's office first disclosing that to me and the search warrant and Las Vegas Metro report that I was able to get between September 6th of 2002 and September 18th or 19th when I filed the motion. The wiretap evidence then is just simply illegal. There's no question about it. There's no question that it's material omissions that go to the heart of what an affiant is telling the issuing judge under the commands of the statute. It is intentional in reckless as to the first, second, and third extension, because it's all after the meeting with Metro and the FBI to discuss what they, what blues was doing, what had happened, how they had gotten to this point and why he was double dealing for the blues original affidavit. But if not intentional, it was reckless because the initial blues affidavit said that it was long reputed that blues was a drug dealer. An initial baby step of any investigation would be to go to the local narcotics police officers and ask about information about this person. If that step had simple step had been taken, they would have said, we've already done a got him. We've got his suppliers. He's working for us. He's doing these things. He everything that the original blues affidavit told the issuing judge that they couldn't do. It was inadequate. They couldn't do. It was already being done, which makes it worse in kind than the Canero case and the other cases. Why don't we go through these one by one and you tell me, you tell me exactly what's wrong on number one. Number one, the loose was apparently stopped and searched by the Las Vegas Metropolitan Police. Now, is there? What's the fault in that? Never happened. That blues was not stopping. No. What? No. They executed a search warrant. They went inside his house. They uncovered all this. There was a never a year to get to the word stopped because it suggests that it was a street encounter. Absolutely. It hid from that. They didn't say it was a street encounter. They just said stopped and searched. No, they said that it was stopped and searched by the Las Vegas Metropolitan Police. Right. Correct. It's easy to say we executed a search warrant. When you say someone stopped and searched, it's conveying something that's different than the true facts. Okay. With respect to the second one, a search of the loser's residence would not likely result in sufficient evidence to prosecute Galeo or street level dealers under the loser Galeo. Wrong. A search had already gotten that information. Blues was on the hook or he faced charges and they already had that evidence. And you and your argument is that the is that the FBI, the FBI knew what what the Metro had already obtained. Yes, because they met with him on December 7th for the express purpose of finding that out. Then they went on the 12th, the 17th and the 16th. Those next three months. Okay. Number three, the third one that they had irrefutable evidence. They have the losers. They had the losers search. They had him confessing to three years of drug dealing. He'd given up Galeo. He had given up a different. Did the FBI have any reason to believe that blues had only given up partial, partially disclosed his criminal activity? None. Because they met with Metro for the express purpose of the FBI knew that blues had given up everything on his activity. That is pretty difficult. And you know, I'm looking at 707 721 because the search warrant and the police report tells you that. And that was the reason they met with him to find out why he was on the phone, hooking up a deal. I will address right quickly. I'm sorry. Did you want to reserve some time? I do. I want to reserve about two minutes. I'm going to briefly say that the, um, the confrontation clauses at issue here because the lose was never called to testify as a witness. I objected to that for the tapes coming in and the Crawford case, which I submitted a 28 J letter addresses that he was available and blues was acting as a government agent receiving evidence. So it was testimonial. It is just like the situation with Sylvia Crawford and Michael Crawford in Crawford V Washington. And I'll address that. But in those cases, uh, it did not involve the, uh, hearsay exception on proof of a conspiracy. And as I read the testimony, uh, also the government, uh, uh, offered this in terms of the, of the context of the, uh, information rather than for the truth asserted. And that's what the district court found. Your Honor, if that was the basis, then obviously it's not in for the truth of the matter asserted, but that raises the confrontation clause because the witness itself is unavailable. And obviously entrapment was the defense at trial. So they took from me by their decision not to call the lose any ability for me to cross examine the voice who was heard the most on the tapes at trial. The primary source of information at trial was Mr. Voluse and he was putting that information together working as an agent of the government and I was unable to cross examine him. Thank you so much. Thank you. Ms. Bliss, do you want this up or down? Oh, it's just fine, Your Honor. Good morning. Good morning. Uh, Kathleen Bliss for the government. Your Honors, all of these arguments that were made, um, all of these assertions, uh, were made before Judge George and Judge George found and did not clearly err in finding that the defendant could not demonstrate that Metro was part of the federal investigation or vice versa. Judge George also found, and this is in the excerpts of a record beginning at page 744, are Judge George's specific findings in the arguments of counseling, but he also found that it was clear that Voluse was only reporting a very small portion of the drug activity he was involved in. The Metro officers, if you go to their testimony, the handler, which is Mr. Jones, as well as the undercover Metro officer, Mr. Hernandez, if you go to their testimony, they say the same thing. They didn't know how much drug activity Mr. Voluse was involved in. They are – I take it that the – Yes, sir. The point that Mr. Kennedy makes is that it's kind of hard to argue that traditional law enforcement techniques have been unavailable, when in fact they have. But they weren't. And the reason why is because no one knew what Voluse was doing as demonstrated by Mr. Voluse. No one could control this man. But the traditional methods and techniques that were used, FBI had begun its investigation using surveillance of Mr. Voluse. And if I may go to my notes real quickly, under the necessity portion, we had – the FBI had three C.S.s. it had been using. The first was a DEA informant, so that informant wasn't controlled by the FBI. The second one had ceased communications with Rick, meaning Voluse, after the early months of 2000. Then you have C.S. 3. This source was probably the most important source. And so beginning in January of 2000, you have this source involved with Mr. Voluse. That's January of 2000 or January of 2001? It would have been January of 2000. Right. That's prior to the affidavits that Mr. Kennedy is complaining of. This is prior to the C.C.A. 156, which is the Voluse affidavit. And what it's demonstrating is what FBI had done in an effort to exhaust, which isn't the standard, but what they had done in an effort to avail themselves of traditional investigative methods. So you have C.S. 3, the most significant of the sources, beginning in January of 2000. And this is all outlaid in the C.C.A. 156, that wiretap. January 2000, Voluse is dealing drugs. February 2000, Voluse is dealing drugs. Seven transactions are observed. There are seven phone calls in the apartment. There's also security cameras that are observed by C.S. 3 within Mr. Voluse's apartment. In May, Mr. Voluse is dealing drugs, not at his house, but at a bar. He's supplying ecstasy. Then in June of 2000, you have two drugs within an hour at Voluse's apartment. July of 2000, you have another drug transaction at the apartment. In September of 2000, you have Mr. Voluse expressing to C.S. 3 that he is concerned, because there were newspaper articles that had come out talking about the ecstasy trade. And this is what C.S. 3 was mainly witnessing, but the ecstasy trade in Las Vegas. So Voluse is starting to get very cagey at this point in time. In October of 2000, Voluse expresses to C.S. 3 that he is wary of the police. And so Voluse starts making more drug transactions at the casino. In November of 2000, FBI Miami confirms that there is a significant drug trade for ecstasy in Las Vegas. Mr. Voluse is surveilled by FBI, again, preceding the 156 application, from April to May of 2000. Now, the affiant tells you that surveillance must cease when Voluse moves into a gated condominium community. Voluse also has become very circumspect, and that's corroborated by what C.S. 3 says, and he's very difficult to trail. As far as necessity, there are pen registers. When did Voluse start cooperating with Las Vegas PD? Your Honor, Voluse started cooperating in August of the 11th of 2000, according to his handler, Mr. Jones. And this is – there was a search warrant that was executed. Now, counsel makes – Then when did the FBI ever debrief Voluse? After Metro? In connection with the wiretap affidavit? In connection with 156, they – Any of the wiretaps, any of their extensions? Only – no, sir. They never – they were trying to wiretap Mr. Voluse. And so there was no debriefing of him. And there was – And I may be confused as to the dates, and please clear them. Sure. It's very confusing, Your Honor. There came a point in time, whatever their prior knowledge was, that the FBI became aware that Voluse was cooperating with Las Vegas Police Department or purportedly cooperating, correct? Yes, sir. That is correct. And was that before or after any of the affidavits were filed to seek wiretaps or extensions? FBI became aware that Mr. Voluse had been searched. And this is the apparent. There's nothing in the record that shows this statement was anything – that FBI believed anything other than what the statement says. They weren't aware in the first application of CCA 156. And the extension, CCA 156-S, you have a statement by the FBI stating that it's become apparent that Mr. Voluse had what they thought was a street encounter with Metro. But, Your Honor, FBI agent Leon did not know about the connection between Metro and Voluse. And that's at the excerpts of record 1159 to 1162. This is in their testimony before the Court. McCain didn't know, and he had become the affiant on the extensions. And that's at excerpts of record 1392. FBI ever asked to interview Voluse? To Metro, no. They had wiretapped him first. They didn't know about his involvement with Metro, Your Honor. At the time that they did the 156 application, they did not know. During the wiretapping that began November the 17th of 2000, that's the FBI's wiretap. That's when they learn through intercepted calls that he's having a contact with Metro. Then in December – This is the call waiting thing that Mr. Kennedy referred to? I believe that's correct, Your Honor. They alert Metro that Mr. Voluse is double-teaming, double-dipping, I think is the word that was used. But the wiretaps continue. And I want to correct something that counsel says as far as the full extent of Mr. Voluse's drug transactions being revealed in the Metro search warrant, which I can't emphasize enough that FBI in its original application did not know about, or in the extensions. They did not Metro testify. They did not know about Marshall or Crozier. It was limited to Mr. Galla. They also, Metro officers also said they didn't realize the extent of what Mr. Voluse was doing. And, Your Honor, even when FBI brings in Mr. Voluse as a cooperator, and that occurs in 2001 on March the 10th, I mean, I'm sorry, on March the 8th of 2001, when they bring in Mr. Voluse, thereafter Mr. Voluse can't even be controlled by the FBI. And was later arrested. That's also in the testimony. And that's what Judge George knew was going on. In fact, he said that Voluse, his conduct throughout the course of dealing with either State law enforcement or Federal, just reinforced the fact that traditional means of law enforcement investigation were not successful. Crawford does not apply, Your Honors. It deals with testimonial statements. At no point in time were Mr. Voluse's statements introduced for the truth of the matter asserted. They were introduced as context. And this Court has approved. Scalia. What do you mean by that term? I'm somewhat vague about what context. Crawford. Your Honor, as I think is very well explained by the Seventh Circuit decision called GAJO, I think I'm pronouncing it G-A-J-O, it demonstrates the use of statements and puts them into context. What you're admitting for the truth of the matter asserted is either in this case going to be the admissions, which are clearly not hearsay of Mr. Marshall, or the co-conspirator statements, which would be those of Jerry Brown. The Court ten times told the jury, you cannot use the statements of Mr. Voluse for the truth of the matter asserted. But it put the tapes, it put these conversations into a context where the jury was focused on the statements that were coming in for their truth, which are also not hearsay. Co-conspirator statements are not hearsay. They're not subject to Crawford. And neither are a defendant's admissions. They're not hearsay. They're not subject to Crawford. Was Voluse available? Yes. I have to say he would have been available, certainly. But this is not an unavailable witness by reason of medical condition or assertion of the Fifth Amendment or something like that. He was available. As far as I understand the record, that's correct. The government could have called him, put him on the stand and said, is that your voice on these tapes, and allowed the defense to cross-examine, right? That's correct. Why isn't that a violation of the Sixth Amendment? Because the statements didn't come in for their truth. And, Your Honor, if I could just refer you to that Seventh Circuit decision. It also cites that it's well-established. Even though it's a 2002 decision, certainly following Crawford, it discusses the distinction. And those statements were not testimonial. And Crawford tells you what testimonial statements are. And in Crawford, those statements are going to include police interrogation by witnesses, statements that are sworn or unsworn by witnesses. These were all taped statements that came in through these taped conversations. And, again, they were limited ten times throughout this trial. The Ninth Circuit in the Whitman decision at 771 F. 2nd, 1348, which is cited in the Well-established case law and Crawford, I submit to you, does not put that into question. Only if those statements had come in for their truth, yes, there would definitely be a confrontation issue. And the laws would have had to testify. The government would have had to call. Well, would that be true even though it's evidence of a co-conspirator? No, sir. Because under Federal Rule of Evidence 801, it clearly excludes, expressly excludes co-conspirator statements. So long as the conditions are met, excludes them as hearsay. And Crawford deals with hearsay. So just like a defendant's admissions, the admissions of Mr. Marshall, those come in under 801 as not hearsay evidence. Was there an objection to that on the confrontation clause at trial? I'm not sure. Well, there certainly wasn't a Crawford objection, because no. Crawford didn't exist. No. Crawford did not exist. I know that counsel objected repeatedly, except when the jury asked to hear those again, and then they didn't object, which we would submit would be examined under a plain error analysis. But I still don't think Crawford applies. And, Your Honors, I can submit a 28-day letter. I will tell you I anticipated or at least thought that Crawford could possibly apply. I looked at Crawford again, and I also pulled recent decisions. I think the Eighth Circuit has ruled on this since Crawford. But I saw Crawford as being an opposite, so I didn't file a 28-day letter. But there are numerous cases out there. There's nothing from the Ninth Circuit except a District of Hawaii case, I believe. Crawford's Supreme Court. Yes, sir, since Crawford. There have been some lower cases, District Court, as well as, I believe, 1-8th Circuit. Okay. Thank you for your argument, counsel. Thank you, Your Honor. Rebuttal argument, Mr. Kennedy? There was a written motion filed the minute that Voluse was not called to testify, arguing on the Confrontation Clause grounds. Second, Voluse was an informant when these tapes were going. He was not a co-conspirator.  Second, the government offered no tape under the co-conspirator exception. Third, it was December 7th at that meeting where the information was given about the wiretaps, and the extensions were that month, December 18th, January 17th, and February 16th. That was 95 percent of the trial evidence. Mr. Voluse, this was an entrapment case, and we cited at page 28. The government cited the Seventh Circuit case for this context-only principle. There is no Ninth Circuit case that permits context-only admission of evidence where the actual speaker is not there to cross-examine. We looked at the facts of every one of those out-of-circuit cases, and on page 28, the court said the declarant is there to be cross-examined. This was an entrapment case. The government has conceded to you that this man Voluse was, no one could control him, and the government precluded me from showing that to the jury. He was debriefed by the FBI. The moment three wiretaps and four extensions, the moment this man was moving serious weight, kilos and kilos, 50, 100 kilos, the moment Bob Marshall came up, they shut down the wire, they served a search warrant, the FBI, in March on Voluse, what they said they couldn't do, they debriefed him, he cooperated again. Why was he on the hook to testify at trial? He was on the hook to cooperate with the government from August 11, 2000, because he was never prosecuted for that, and he had to agree to continue to work with them. I think you are wanting to wind up here substantially over your time. And he was available because he was under a written agreement with the government not to be prosecuted for his efforts after that with the feds, and they only prosecuted him when he dealt drugs a third time and was caught. Thank you. Thank you. Thank both counsel for their arguments. The case just argued will be submitted for decision. We'll proceed to the next case on the calendar this morning, which is United States v. Mendez-Garcia. Counsel will come forward, please.
judges: Lay , Hawkins, Bybee